Hull, J.
This is the second time that this case has been in this court. A judgment in favor of the plaintiff below for $5,000 was affirmed at a former term of this court, (20 O. C. C., 558), and the case was thereafter taken to the supreme court, and was by the supreme court reversed on the ground that the trial court *561 'had erred in refusing to give an instruction requested by the defendant below. The case was tried again, and a verdict •returned for $10,000, upon which judgment was entered by the court of common pleas, and it is this judgment which is sought to be reversed in this proceeding in error.
The general grounds of error complained of or claimed by the plaintiff in error, are that the court should have directed a verdict for the defendant below; that the verdict was against the weight of the evidence, and not sustained by sufficient evidence; that the court erred in its charge to the jury and in its refusal to give certain requests of the defendant below; and that the damages are excessive, and that the judgment should ’be reversed on that ground.
The action was one for personal injuries which the defendant in error claimed he sustained on account of the negligence >of the plaintiff in error, in running a locomotive at a highway ■crossing in the city of Toledo. On the morning of July 20, ■1899, a little before six o’clock in the morning, standard time, the plaintiff with his brother was riding in a lumber wagon, as it is called, there being nothing on the running part of the wagon except a long board reaching from one side 'to the other. The brother was driving the horse, there being only one horse hitched to the wagon. The plaintiff below was sitting behind his brother on this board, perhaps three or four feet ■behind. The defendant in error had gotten on the wagon •with his brother some 500 feet west of the railroad crossing, •on Buckeye stre'et, the crossing of Buckeye street, with the 'Wheeling & Lake Erie railroad being north of their depot 'in Toledo, perhaps a mile north! — some distance at least. As I say, he' got on the wagon, as he claims, about 500 feet west •of the crossing, and his claim is, and it is the testimony of liis brother, that the view was so obstructed at the ■crossing that they were unable to see approaching trains until they were very near to the main track. And the plaintiff below claims that he looked and listened, and that his brother did likewise, as they were approaching the crossing, and neither saw nor heard the locomotive. The plaintiff below was sitting with his face towards the south, or toward the depot, and his brother was sitting with his face toward the *562 north, both sitting on this plank which ran lengthwise of the wagon; and he claims that he was unable to discover, or to see or hear any train or locomotive as it approached, until the horse’s front feet were on the main track — there being at this crossing a main track and two side tracks/ — and just at this time, the plaintiff below claims, a locomotive appeared behind these obstructions, running at the rate of from 20 to 30 miles and hour; Suhrwiar at that time being, as he claimed, from fourteen to sixteen feet from the main track, the horse’s fore feet, as I have said, being on the track. He testifies that he remained on the board until he was nearly to the railroad track, and then jumped off, jumping forward — running and jumping, probably — so that he cleared the track, but when he was beyond and east of the track, the locomotive struck the hind wheels of the wagon, and the hind part of the wagon was broken off, and one of the wheels, it is claimed, was thrown upon his back, from which he sustained serious injuries.
The plaintiff below, Frederick Suhrwiar, is co-orborated in his testimony by his brother John, who was with him, and to some extent by one or two witnesses who were in the neighborhood, and either heard the crash at the time of the collision, or saw something of it. Both Fred and John Suhrwiar testify that no signal, either by bell or whistle, was given before the locomotive was seen.
At the close of the testimony of the plaintiff below the railroad company moved the court to instruct the jury to return a verdict in favor of the defendant below, which was refused and overruled by the court; and this, it is claimed, was error. After the overruling of the motion the railroad company declined to offer any testimony, and the case went to the jury upon the testimony offered by the plaintiff below alone. The jury was charged by the court, and returned a verdict for $10,000.
It is claimed by the railroad company that under the undisputed facts in this case, and upon the testimony of the plaintiff himself, he was not entitled to recover. The claim is, that according to his own testimony, he was guilty of contributory negligence.
According to the testimony, no signal was given on the locomotive, either by bell or whistle, until almost at the very instant *563 that the accident occurred; but the claim of the railroad company is, that notwithstanding the evidence showed negligence on its part, Suhrwiar himself was guilty of contributory negligence, and therefore that he cannot recover, under the well established rule in this state, and everywhere, practically. It is claimed that under his testimony he saw the locomotive approaching when he was from fourteen to sixteen feet from the track, the horse being at this time, on a walk, going from a mile and a half to two miles an hour, and it is urged that he then, having an opportunity to get off the wagon, not availing himself of it, but staying on, and attempting to cross the track, thereby .took his own chances as to injury, and that his conduct and acts upon the occasion in question were in law contributory negligence, and bar a recovery.
No testimony having been offered by the defendant, the question is squarely presented to the court, practically as a question of law, whether the facts were such that the court can say, 'as a mattter of law, that the jury were not warranted in finding that the defendant in error was not guilty.of negligence contributing to his own injury.
The engine was coming backward, the tender being ahead, according to the testimony, with some considerable coal piled up upon it. There, was no man on the tender or in sight on the locomotive keeping a lookout.. Suhrwiar was familiar with this crossing. He lived in that vicinity; he crossed it a good many times; and on this morning in question he had before that time gone across four times, and had gone over it but a short time before the accident, for the purpose of putting his cows in a pasture, and had. just, done this when he got qn the wágon with his brother to return. He knew that trains and locomotives passed about this time of day rather frequently; and according to the testimony, as I have stated, the view was obstructed as the crossing was. approached from the west. There was a coal shed of.considerable height — eleven feet high —on one side; there was a wood shed or wood house which also obstructed the view, to some extent; there were high fences on that side of. the track; and there was.a car standing near the crossing which also obstructed the view, as the crossing was approached. When the- case was here before the record contained evidence as it does now of these obstructions, *564 but it did not contain the positive statement of the plaintiff below, as it does now, that he saw the locomotive when within from fourteen to sixteen feet of the crossing. We, held at the former hearing, in the absence of this positive testimony of the plaintiff below, that'the obstructions were of such a character, that the testimony of the plaintiff and his brother was such as to their keeping a lookout, that it was a fair question for the jury as to whether he exercised ordinary care in approaching the crossing, in view of all the circumstances. It is now urged by counsel for plaintiff in error that under this record, in view of this positive testimony as to plaintiff below seeing the train at the distance mentioned, he must be held to have been guilty of contributory negligence, as it is argued that there is no longer any room for inference or speculation as to where he was when lie first saw the locomotive. The evidence further shows that the locomotive at the time he saw it was about 200 feet north of the crossing. We have examined the record in the case with a great deal of care. The amount involved is large and the case therefore important to both parties.
The law of the case is pretty well settled in this state. The rules relating to Suhrwiar’s duty to look and listen as he approached this crossing, and his liability in case he recklessly attempted to cross in front of a moving train without any excuse therefor, are well established by the decisions of our supreme court. Some of these cases have been cited by counsel for plaintiff in error, and will be referred to later.
Whether the plaintiff below was guilty of contributory negligence at this time we are to determine from the facts as shown by the evidence in the case, and from the circumstances and conditions that surrounded him at the time. The question is, whether, under the rules of law, he exercised at that time, and whether the jury were warranted in finding, that he exercised ordinary care or not. It appears from his testimony and that of his brother that they were looking out for the approach of trains as they neared this crossing — were looking and did look in each direction. Their horse was going on a walk, and the street was not paved, so that the wagon made little noise. The plaintiff testifies that he looked in both directions, and saw no locomotive, and heard none, until, as I have said, he was .within about fifteen feet of the main track, and the *565 horse’s front feet were then upon the main track. He then, saw the locomotive approaching backwards from the north, and, as he says, coming at the rate of from 20 to 30 miles an. hour. His brother was driving the horse, and plaintiff below hollered to his brother, as he testifies, that an engine was coming, at about the same time, or almost exactly at the same time, his brother saw the engine. The plaintiff below testifies in some parts of his testimony that almost immediately, his brother struck the horse with a whip to urge him across the track. In one place in his testimony, at least, Suhrwiar testifies that the horse went about eight feet after he saw the engine before his-brother struck the horse with the whip, and that the horse continued on a walk up to that time. He says in other places that he struck him with the whip very soon, he can't tell just how soon. His brother ¡testifies that almost immediately after he discovered the engine he struck the horse with the whip. When the horse was struck with the whip, they testify, he-jumped. I especially refer to this testimony, because it is-claimed here that the plaintiff below had ample opportunity to* get off the wagon before the horse was struck with the whip, and that he was guilty of negligence in not so doing. The-plaintiff below on page ten of the record says:
“When I discovered the locomotive I hollered. ‘John,' I says, ‘engine coming;’ and I noticed on him that he was sitting-in this shape, and throwed his head. Before we were coming-in this shape, and as soon as I hollered he seen the same thing, and he hit ¡the horse, and the horse made a kind of a jump. I seen the engine came very fast; just came flying like the wind" came onto me, and so I jumped off the wagon. I jumped’ across off the main track, and as soon as I thought I was all’ right) — I was off the track — I got struck. Then I flew quite a distance away.”
He says he was past the main track when he was struck. And on page eleven he says that he heard the whistle at the-same ¡time that he got struck. He says at another place in his-testimony that he did not jump as soon as he saw the engine that he thought they could get past. And he says again in his testimony that he could not jump at first; that the horse-jumped, and that that jerked the wagon; that after the horse-' jumpéd he slacked -up, and -then plaintiff got off. He says that: *566 he could not .get off before that on account of the horse jumping. At another place in his.testimony, as I have said, he says he thinks perhaps the horse was about eight feet from the track when his brother struck the horse. His brother testifies that as soon as he saw the locomotive he whipped up the horse, and soon after that he saw his brother running by the side of the horse and wagon. He didn’t see him jump off, he says, but he saw him running along side of the horse; and he says that his brother got some two or three feet beyond the track before the locomotive struck the hind wheels of the wagon, and threw the wheel against Fred. John testifies that the horse was about in the middle of the track when they saw the locomotive.
It is urged by counsel for plaintiff in error that these facts as testified to by the plaintiff below and his brother make the defendant in error guilty of contributory negligence at the time in. question. It is claimed that when he saw this locomotive, being sixteen feet away from the track, it was his duty at once to jump off the wagon, and' that inasmuch as he says in his testimony that he thought he could get over, it is urged that he took his chances, and therefore cannot recover. The plaintiff below is asked if he could not have gotten over the hind end of the wagon. He testified that he could not in time; he would have to pull his feet up and get over the end of the board. As I have said, the locomotive was about 200 feet away when it was discovered. If it was running twenty miles an hour, it would take about seven seconds to reach the crossing where the collision occurred, after it was seen by the plaintiff; if it was running thirty miles an hour, it took about four and a half or five seconds to travel the 200 feet; if it was running thirty-five miles an hour, of course it would take a comparatively less time. So that it appears, under any of testimony as to the speed with which the locomotive was traveling, that it was not oyer six or seven seconds from the time the plaintiff below saw it before it struck the wagon. The testimony shows the state of the consternation plaintiff and his brother were in when this locomotive appeared, going at this rate of speed, with the front feet of the horse on the track. Probably the speed with which this locomotive was traveling did not once occur to the plaintiff below and his brother. They were suddenly confronted by a peril and great danger. What it was best to do under the- cir *567 ■cumstances to save his life the plaintiff below was obliged to determine in a very short space of time: whether it would be better to get off the hind end of the wagon; whether there was .time to cross the track, the horse then being on the track; whether it would be safe to jump off the wagon, in view of the iact that the 'horse was liable to be started by a blow of the whip at any moment, were all things that he was obliged to ■consider, in determining his course of conduct. The substance ■of his testimony is, taking it all together, that almost immediately after the engine was discovered the horse was struck a blow with the whip, and he says he could not get off while the horse was jumping, as he puts it; and it is clear that it would have been dangerous. It is always dangerous to jump off a moving wagon, and it would have been dangerous in this case for the plaintiff to have jumped off just after the horse had been struck with the whip. He might have been struck by the wheel of the wagon and knocked down, and run over by the wagon, or might have been struck by the wagon and knocked under the train. The horse may not have been struck by the whip until he had gone a few feet after the locomotive was seen. It is not entirely clear from the testimony whether he was or not. He was certainly struck by the whip and started very soon after that. Suhrwiar testifies that as soon as the horse slackened up he did jump, and he cleared the ’track. Suhrwiar was not struck by the locomotive when he was upon the track. He had concluded that he could get across, and he ■did get across, and was some feet on the east side of the main track when he was struck by the hind wheel of the wagon, so that it cannot be said that he miscalculated in his ability to get across the track, for he did in fact get across, and would not have been injured if the locomotive had not struck the wagon. Suhrwiar went faster than the wagon went when he jumped off on the ground and ran ahead; and although he got across, the wagon did not get across, and he was injured in the way I have suggested. When Suhrwiar was sitting upon this wagon, with this peril suddenly confronting him, with an engine only five or six or seven seconds away, with the horse’s front feet upon the track, with the lines in another man’s hands and the whip in another man’s hands, it- was pretty difficult for Suhrwiar to tell, and would be for any man to tell in an instant, what *568 was the safest thing to do under the circumstances. If he-jumped off at once, he would have been very near to the track, on the west, with the liability of the horse and wagon being-struck and thrown against him, perhaps, on that side of the-track; if he jumped off after the horse was struck with the-whip, as I have stated, he took the chance of being knocked" down by the wagon, or knocked under the train. He says he-thought there was time to get across. He staid on a few moments and he got across, but was injured by the wheels of the-wagon being thrown ¿gainst him at the time of the collision. It is perhaps possible, looking back at his conduct at this time,, to discover that Suhrwiar might have adopted a better course.. It might have been better for him to have jumped immediately after the horse jumped or before, but his conduct must be considered in .the light of the events that surrounded him at that time. Hi's conduct must be considered in the light of the peril' that he saw before him, of the state of mind that he must have been in, in view of the very few seconds of time that he hád to-determine what was the best course to pursue; and if he exercised ordinary care under all the circumstances, if he conducted'-' himself as a man of ordinary care and prudence would have-been wont to do, then he is not guilty of contributory negligence, although he may not in fact have done what was the-very best thing to do at the time. Two or three Ohio cases were cited by counsel for plaintiff in error as laying down the proper-rule of conduct. Te supreme court say in Cleveland, C. C. &I. Ry. v. Elliott, 28 Ohio St., 340, in the syllabus:
“The omission to ring the bell or sound the whistle at public - crossings is not of itself sufficient ground to authorize a recovery, if the party, notwithstanding -such omission, might,., by the exercise of ordinary care, have avoided the accident.
“What is such contributory negligence as will defeat a recovery is usually a question of mixed law and’fact, to be determined by the jury from all the circumstances of the catee and' under proper instructions from the court; but where the undisputed facts show that by the exercise of ordinary care a party - might have avoided injury, he cannot recover.
“It is the duty of a traveler upon the highway, when approaching a railroad crossing, to make use of his senses to ascertain if there is a train in the vicinity; and if, when in full’ *569 possession of his faculties, he fails to see or hear anything, when a prudent man, exercising his eyes and ears, with ordinary care, would have discovered a train in close proximity, and he is thereby injured, he is guilty of such negligence as will prevent a recovery.”
It appears from reading this syllabus, that the supmeme court say, the question is whether he exercised ordinary care. It is his duty as a matter of law to look and listen' when he approaches a railroad crossing, and a faiure to do that, without reasonable excuse therefor, constitutes negligence as a matter of law. Suhrwiar, however, did look and listen. He saw the engine approaching. The main question in the case is, whether he exercised ordinary care after he saw the locomotive, in doing what he did. Another case cited by counsel, which lays down the rule of conduct in such cases, is a leading case— Pennsylvania Co. v. Rathgeb, 32 Ohio St., 66 — where the supreme court say:
“Ordinary prudence requires that a person in the full enjoyment of the faculties of hearing and seeing, before attempting to pass over a known railroad crossing, should use them for the purpose of discovering and avoiding danger from an approaching train; and the omission to do so, without a reasonable excuse therefore, is negligence, and will defeat an action by such person for an injury to which such negligence contributed.
“In an action for damages for alleged negligence, the question of negligence on the part of the defendant ,or of contributory negligence on the part of the plaintiff, is generally a mixed question of law and fact, to be decided by the jury, under proper instructions from the court.
“But if all the material facts touching the alleged negligence be undisputed, or be found by the jury, and admit of no rational inference but that of negligence, in such case the question of negligence becomes a matter of law merely, and the court should so charge the jury.”
Considering all the facts and circumstances that surrounded Suhrwiar at the time in question, we cannot hold as a matter of law that his conduct after seeing the locomotive, “admits of no rational inference but that of negligence,”
*570 But it is alleged further by counsel for plaintiff in error-that' he in fact was guilty of negligence in not stopping before he reached the railroad crossing, and either' making an observation or having his brother make an observation, to see whether a locomotive or a train was approaching. It is' argued that the fact that the view was obstructed only increased the degree of ■care that he was obliged to use; and it is claimed if they had stopped the wagon, and one of them gone ahead and looked, that the accident might have been avoided; and some authorities are cited to sustain the proposition that it was his duty to stop. One of .the cases is Pennsylvania Co. v. Morel, 40 Ohio St., 338. The supreme .ourt say:
“M., approaching a railway crossing with a team drawing a loaded wagon, heard a whistle announcing the near approach of a train, but drove on without stopping, although ms view was practically obstructed, and the noise of his own wagon drowned that of the train; he attempted to cross the track because he ‘thought he could get .across before the train would come.’ The locomotive damaged his person and his wagon. Held: The fact that the view was obstructed did not excuse his neglect to stop and listen: it made his duty to do so greater. We think the evidence clearly proved him guilty of contributory negligence.”
It appears, however, in this case that the plaintiff heard the whistle announcing the near approach of a train, but he drove on without stopping to ascertain how near the train was, or whether it was likely to strike him at the crossing. He knew a train was approaching, and from where he was, he was unable to see the train, but notwithstanding that, he drove on, attempted to cross, and was struck. The effect of the holding is that when he was warned by the whistle that a train was approaching that he could not see, it was his duty to stop and ascertain where the train was before he attempted to.cross; but there is no holding of the supreme court, so far as we are able to discover, that as a matter of law it is the duty of a traveler upon a highway when approaching a crossing, to stop and look and listen for approaching trains. It may be a question for the jury to determine — and that was submitted to the jury in this case — whether ordinary care, under the circumstances, requires a person to stop and look and listen for approaching *571 trains. If he is riding in a wagon that makes a great deál of noise, it may be his duty to stop, or there may be other' circumstances that would make it his duty to stop and listen, as a matter of ordinary care, before attempting to cross; but there is no positive rule of law in this state that it is the duty of a'traveler upon a highway to stop and look and listen for approaching trains. That may be the rule in some other states, at least in Pennsylvania, but we do not understand, it to be the rule in Ohio.
Another case is cited to sustain this proposition — a case decided by the circuit court of this circuit in 1893 — where it is said it was held to be the plaintiffs duty to stop and look out for approaching trains, and it is so held under the facts in that case. The case is found in Lake Shore & M. S. Ry. v. Geiger, 8 Ohio C. C., 41. It appears, however, from the reading of the case that the court found at a matter of fact from the evidence that the plaintiff saw the train approaching, and notwithstanding that whipped up his horses and attempted to cross. The second paragraph of the syllabus is as follows:
“When at such crossing and at such time, and under the circumstances, above recited such traveler actually sees the approaching train,and when, if he had stopped, he would have been secure from danger, and he does not stop, but attempts to drive over said crossing ahead of the train, and is hit and injured by the train at the crossing, he cannot recover damages from the railway company for such injury.”
The plaintiff did not testify in this case. The court say on page 311:
“He does not testify here whether he saw it or not; but his companion, who was in a position where he could not see the train as quickly as the plaintiff, testified that he saw it when he was several yards away. His statement is, that they were too close to turn around and get out of the way. But he saw the train coming, and the plaintiff could have seen it for a long' distance if he had looked at the time. Well, now, he either (saw it and attempted to get over ahead of it, or else being chargeable with-the duty of looking to see, he did not look and did n.ot see. He whipped up his horses at a -certain point before he had gotten to the-south-main track; he ‘encouraged his *572 horses,’ as one witness said, and as the other said, he ‘seemed! to hurry them up, and whipped them with the lines or hit them with a whip.’ There is some evidence tending to show also-that when the wagon was between these t-wo lines of box cars, his companion called his attention to the fact that he had better get out and look, and plaintiff then says, that somebody said ‘it is all right and go ahead,’ and that the plaintiff did urge his-horses. The companion of the plaintiff on the wagon testified t^iat while plaintiff said that, he, the witness, did not hear anybody say ‘it is all right, go ahead;’ and did not see any one.”
“From all the circumstances of the case, we think he did look, and did see the train, and that he concluded he would whip up his horses, and attempt to get over before the train-got there, and that he made a miscalculation in his judgment, and that that judgment which he then exercised, he had no-right to put to the test under such circumstances, and had no-right to risk the chances of his getting over the track in front of a fast coming train.”
So it appears that court found in that case that when Geiger-was in a place of safety, before his horses had reached the track, When he had abundant opportunity to stop or turn back, he in fact saw the approaching train, but concluded that he would-whip up his horses and cross in front of it, and that while attempting ,so to do he was injured. This was clearly negligent, and was not necessary to decide whether it was his duty to> stop before he saw the train. In this case Suhrwiar testifies that he did not see the train until his horse was in fact upon the railroad track, and that he did not hear it, and had no knowledge of its approach until that time. What he did after that, under the circumstances that surrounded him, has been discussed. If his brother was guilty of any negligence in striking the horse with the whip, that negligence, under theru'le in this state, cannot be imputed to the plaintiff below.
Another case is cited — the recent case of Wabach R. R. Co. v. Skiles, 64 Ohio St., 458, (45 Bull., 386), decided May 7,. 1901. This from the syllabus is quoted by counsel for plaintiff in error:
“Ordinary care requires that a person in the full enjoyment of the .faculties of hearing and seeing, before attempting to-pass over a railroad track, should use them for the purpose of *573 ■discovering and avoiding danger from an approaching train; and an omission to do so without reasonable excuse therefor, is negligence which will defeat an action by such person to recover damages for an injury to which such negligence contributed.”
This is practically a repetition of the rule that had been before laid down by the Supreme Court, which requires a person to use his faculties before attempting to cross a railroad track. The decision does not say, however, that a person is required to stop. The facts of the Skiles case were, that the plaintiff was standing on a railroad platform, being an employe, and obliged to cross a track and go to a train to perform certain duties upon a car. He had waited for a train to pull out which stood between him and the train where his duties called him. As soon as the train went out, without looking, so far as appears from the petition, to see whether a train was approaching from behind the outgoing train, he ■stepped upon the track behind the train, and an approaching locomotive struck him, and he was hurt, no excuse for not looking or seeing the engine being pleaded. The court held that the petition showed on its face that he was guilty of negligence, and did not state a cause of action, and no evidence could be admitted under it.
After a very careful examination of this record, we are unable to find that the plaintiff below was guilty of contributory negligence. We think that under the facts as shown by the •evidence, it was a proper question to submit to the jury, and that their finding upon it cannot be disturbed by a reviewing court.
Now as to the charge of the court. It is claimed that the court erred in refusing certain requests, and this is urged and insisted upon. The first judgment was reversed by the Supreme Court for the refusal of the trial court to give the fourth request. This was given on this trial by the trial court, so there can be no reversal on that ground. The court was asked to give this request: ' .
“6. If these buildings were obstructions to the view, and you find that plaintiff expected an engine to cross about that time, then it was his duty to stop as well as look and *574 listen. If he did not stop, and yet expected an engine to cross about that time, then your vierdict must be for the defendant.”
I have already discussed that proposition, practically, in discussing the evidence, and we are of the opinion that it would not have been proper, with the evidence in this case, for the court to have instructed the jury that it was the plaintiff’s duty, as a matter of law, to stop and look and listen for an approaching train. The court did instruct the jury 'in the next paragraph :
“It was the plaintiff’s duty to be on the alert and on the lookout for danger; and his care must be greater if there are obstructions and he expects a train or engine is about to pass. Therefore, in this case, if there were obstructions and he expected an engine, ‘the plaintiff’s action in going upon the-track immediately preceding the injury puts in question his due exercise of care for his own safety. In such a case the burden is on the plaintiff to show he exercised such cafe.’ ”
The ioth request was also refused. It was as follows:
‘To. If the plaintiff saw the engine in time to have avoided the collision, he cannot recover a judgment even though the crossing signals were not given, and there were obstructions. He saw this engine when he was about 16 feet from the track. He was sitting on a 'plank lying lengthwise on the wagon, and about 3! feet from the ground. The horse was going from i-J miles to two miles an hour. He had gotten on the wagon while it was moving at the same rate.' If under these circumstances he could have gotten off before reaching the main track, and after seeing the engine, thlen your verdict must be for the defendant.”
In view of what has been already said in discussing the evidence in the case, it is clear, and we are of the opinion that this ought not to have been given. This instruction would have required the plaintiff to get off the wagon in any event, if he saw the engine when he was about sixteen feet from the main track, then, if under these circumstances he did not get off, the verdict must be for the defendant. That would practically have been an instruction to the jury to return a verdict for the defendant. . The moment he saw the engine it is clear he could have slid off the board and fallen on the ground, whatever might have happened to him. But we are of the *575 opinion that the court could not say to the jury that in the exercise of ordinary care, considering the conditions and circumstances with which he was surrounded, that he was obliged to do that, or in default he was barred from recovery. The nth request was refused:
“ii. If after seeing the engine the plaintiff had time to avoid the collision by getting off the wagon, but did not get off because he thought he could get across ahead of the train,, then your verdict must b:e for the defendant. And your verdict must still be for the defendant if you further find that he afterwards changed his mind and tried, to get off when it was too late.”
This request has to some exetnt the same objection that is offered to the tenth. It instructs the jury if after seeing the engine the plaintiff had time to avoid the collision by getting off the wagon, and did not, he cannot recover. As I have already said, he did have time to get off this wagon in some way; but we must consider the question in view of the circumstances that surrounded him, including the fact that the horse was strück with the whip almost immediately after Suhwiar saw the locomotive. He did not get off immediately, but he did in fact, as the evidence shows, get off in time to clear the track himself. The twelfth was also refused:
“12. If you find from all the circumstances of the case that the plaintiff looked and did see the engine, and that, after seeing the engine, he concluded that they could pass the main track before the engine reached the crossing, and for that reason did not attempt to leave the wagon, and that he made a miscalculation in his judgment, the court say to you that he had no right- to risk the chances of. his getting over the main" track in front of a fast coming train.”
That request is subject to the same general objections that the others are. . It takes from the jury the question whether, under all the circumstances, he exercised ordinary car or not, having in view his situation at the time, and all of the things that he had to cbnsider, and the short time he had to act.
It is objected further that the general charge of the court is defective and erroneous, in that it is made up of abstract propositions of law, and a general discussion of the law, rather than definite instructions to the jury. We have examined the *576 ■charge of the court — I will not stop to read from it — and we think, in connection with the special instructions that were given at the request of the defendant below, it gave the jury very clear and full instructions upon the law of the case, and that it is not, taking the charge altogether, subject to the criticism that it is made up almost wholly of abstract propositions of law. On page 96 of the record will be found the court’s instructions to the jury upon the question of ordinary care and the duty of the plaintiff as he approached this crossing, and the general instructions on contributory negligence, and the court lays down in very clear and appropriate language the general principles announced by the Supreme Court in the cases to which I have referred.
It is urged further and lastly, that the damages 'in the case are excessive, and that for that reason the judgment should Be set aside. The verdict was a large one. Ten thousand dollars is a large verdict in such a case — an unusual verdict, perhaps; and the question is, whether, under the evidence, the jury were warranted in returning a verdict for that amount. At the first trial the verdict was only $5000. The first trial occurred but a few months after the injury, and the last trial occurred about two years after the injury, when plaintiff’s condition was fully developed, and the results of his injury could be ascertained with practical certainty. The plaintiff Suhwiar was examined by four physicians- — -Dr. Wright, who was the attending physician from the beginning; Dr. Stewart, who had been in practice for some twenty-seven years; Dr. Westfelter, and also Dr. Rool, who examined him as a representative and also at the request of the railroad company, but was not called as a witness upon the trial. Dr. Wright and Dr. Stewart were called as witnesses, and testified to his condition. Dr. Wright testified that his leg was broken just above the ankle — both bones- — and that the bones were shattered ; that they did not unite for a long time; and that his leg at the time of the trial was still disabled, and in his (the doctor’s) judgment, he would always be unable to perform manual labor requiring him to stand. Both he and Dr. Stewart testify to that. They say that he can do nothing that would require him to stand on his feet. Suhwiar testifies to the pain that he suffered, and that his leg was in such condition *577 that it was impossible for it to be hung down. Although he walks with a crutch, his leg soon begins to pain him, and he has to sit down to give it relief. Dr. Wright testifies that at the time of the accident Suhwiar’s bladder was paralyzed. He explains the connection between the muscles of the bladder and the spinal cord. He is of the opinion that by this blow upon the back the nerves were paralyzed, so that he lost the use of his bladder, and was' unable to void any urine for some weeks, and instruments had to be used for that purpose; and on account of this blow his rectum was paralyzed, and he was unable to empty his bowels. Dr. Stewart, who examined him shortly before the trial, also says' his bladder is still paralyzed to some extent, and his rectum also, and says that on account of this paralysis Suhwiar was unable to void all his urine when he passed water, and a portion of the urine would remain in the bladder, which became putrid and decomposed and poisonous, and set up irritation which might affect the general health of the patient. And Dr. Stewart testifies that his bladder is in such condition that there is an almost constant irritation, and an apparent desire to urinate. On account of this condition of his bladder and the pain in his back and le]g, Suhwiar testifies that he is now unable to sleep more than about three hours during the night. On account of this condition of the bladder, the urine becomes purulent and thick, and when passed is sometimes bloody, and of a ve'ry strong odor. The physicians agree -that he is permanently disabled; that his condition will not improve, probably, to any perceptible extent. At the time of his injury he was thirty-one years of age. He was thirty-three when the trial was had. He was earning $2.50 a day — over $700 a year; was in good health and good physical condition. The jury had a right to take all these things into consideration in fixing the! amount of damages; the lessening of his earning capacity, his physical condition before the injury, his impairment, the suffering and pain which he had endured and which he was likely to suffer; the fact that his leg was permanently injured; his inteirnal injuries, which according to the physicians’ testimony, were of such a serious and permanent character, were all competent to be taken into consideration by the jury; and we are unable to say as a matter of law that a verdict of *578 (this amount is excessive, for the injuries', which, under the undisputed test'mony in this record, the plaintiff below sustained.
Doyle & Lewis! and C. A. Seiders, for Plaintiff in Error.
Seney & Johnson, for Defendant in Error.
Upon a review of the whole record, we find no error to the prejudice of the plaintiff in error, and the judjgment of the court of common pleas will therefore be affirmed, but without penalty.